### KEENE v. GOLD et al.
### No. 8410.

Court of Civil Appeals of Texas. San Antonio.
April 9, 1930.

Rehearing Denied May 14, 1930.

Matlock & Kelley, of San Antonio, for appellant.

Cunningham, Moursund & Johnson, of San Antonio, for appellees.

COBBS, J.

Appellant sued appellees and prayed for a rescission of the exchange of properties on July 15, 1926, a cancellation of the deeds and notes then executed, and a complete restitution of the parties to their former status. The property originally owned by appellant having been conveyed by appellees, the value of the equity of such property was prayed for, with interest thereon, less the amount received by appellant in the operation of the land. It was further alleged that the trade was made upon the basis and the representation that the appellees would timely cause a separation of the $3,400 debt assumed by appellant from the blanket lien and note for $17,300 held by the San Antonio Joint Stock Land Bank on appellees' land. That appellant would not have made the trade except for the fact that he believed said statement to be true, and accepted the promise of appellees and their agent to accomplish the separation of the land as a part of the consideration moving to him in the transaction. And that appellees failed and refused to carry out their agreement in this respect.

Appellees answered with general denial, with a special denial that any fraudulent statements or promises were made by their agent at any time, and in addition pleaded that no duty rested upon them to procure a separation of the loan, and further that defendant had estopped himself from any remedy of rescission, and fully ratified and confirmed the exchange of properties after his discovery of the fraudulent nature of the alleged statements of H. M. Maud, the agent of appellees, which he claims induced him to enter into the trade and after the discovery of the alleged failure of consideration. By cross-action, appellees asked for judgment against appellant for the amount of the indebtedness of $3,600, evidenced by a series of seven notes, together with interest and attorney's fees, and costs of suit.

At the conclusion of the testimony the court gave a peremptory instruction to the jury to find for appellees.

That instruction is assigned as error, and though the case has been elaborately briefed by both parties, we shall confine this opinion to the single issue as to whether it was error or not.

The courts have universally held that such charges generally constitute error. The charge in this case is:

"Gentlemen of the Jury:

"You are instructed to return the following verdict in this case: 'We the jury find for the defendants and against the plaintiff so far as plaintiff's suit is concerned, and that plaintiff take nothing by his suit, and find for defendants on their cross action against plaintiff for the sum of $3,600.00 principal of the notes sued on, together with interest thereon at the rate of seven per cent. per

annum from July 1st, 1927, together with ten per cent. additional on such principal and interest as attorney's fees and also for the balance of principal amount of the extension agreement, said balance being the sum of $355.72, together with interest thereon from May 15, 1928, at the rate of eight per cent. per annum, and ten per cent. additional on the amount of such principal and interest as attorney's fees, and we further find for defendants for the foreclosure of the lien pleaded by them on the 284.6 acres of land described in plaintiff's petition, in satisfaction of the amounts of principal, interest and attorney's fees herein found for the defendants, such foreclosure and any sale thereunder being, however, subject to the lien held by the San Antonio Joint Stock Land Bank to the extent of the sum of $3,400.00 of the $17,300.00 note of said Bank, with interest thereon.'"

In Black's work on Rescission and Cancellation, vol. 1, § 1, "rescission" is defined as follows:

"To rescind a contract is not merely to terminate it, but to abrogate and undo it from the beginning; that is, not merely to release the parties from further obligation to each other in respect to the subject of the contract, but to annul the contract and restore the parties to the relative positions which they would have occupied if no such contract had ever been made. Rescission necessarily involves a repudiation of the contract and a refusal of the moving party to be further bound by it. But this by itself would constitute no more than a breach of the contract or a refusal of performance, while the idea of rescission involves the additional and distinguishing element of a restoration of the status quo, that is, an offer by the moving party to restore all that he has received under it, with a demand for the similar restoration to him of all that he had paid or given under it, and, in effect, a mutual release of further obligations."

The contract of sale executed by the parties on June 11, 1926, specifically obligates appellees to have the lien, securing the note of $17,300, in favor of the San Antonio Joint Stock Land Bank, on the 1,444.2-acre tract of land, of which the 284.6 acres contracted for is a part, separated at their own expense, and to arrange for a separate loan on the 284.6 acres with said Joint Stock Bank, for such an amount as is obtainable thereon, as soon as possible, in accordance with the rules and regulations of said bank. As soon as the loan was separated and divided, appellees were to execute a full and legal warranty deed to appellant assuming the amount of obligation accepted and placed on said 284.6 acres, separately and independently from the entire tract of 1,444.2 acres, which amount was to be deducted from the $7,000 to be paid by appellant to appellees, and for the amount remaining after this deduction appellant was to execute to appellees vendor's lien notes against the land contracted to be sold; which notes were to be due and payable on or before five years after date of the contract bearing interest at the rate of 7 per cent. per annum from date. The notes were to be in such denominations as appellant preferred, however not to be less than $500 each. And it was understood and agreed that the lien of the Joint Stock Land Bank was the first and superior lien, and the vendor's lien to appellees secondary and inferior thereto.

Appellees bound themselves to use due diligence in carrying out all the agreements of the contract, and to furnish a regular and legal deed at the earliest date possible, provided appellant complied with all of his agreements mentioned in the contract.

The deal was closed on July 15, 1926, and the deed to the 284.6 acres of land in Frio county delivered to appellant. Appellant complied with the terms of said contract by assuming $3,400 of the $17,300 indebtedness of appellees to the Joint Stock Land Bank, and executing to them his seven vendor's lien notes, aggregating the sum of $3,600, and in addition thereto conveyed to them his homestead in San Antonio, at a valuation of $11,200, subject to an indebtedness of $4,000; and paid taxes for the year 1927 on said property, and $119 as interest on the $3,400 assumed of the indebtedness of appellees to the Joint Stock Land Bank, which fell due January 1, 1927, all the time believing that appellees would secure a separation of said loan, as they had contracted to do.

When the interest on the $3,400 of the $17,300 indebtedness, assumed by appellant, amounting to the sum of $238, and the interest on the seven notes executed by appellant to appellees, amounting to $252, and $45 for taxes for the year 1926 on the 284.6 acres of land conveyed to appellant, aggregating the sum of $535, became due on July 1, 1927, appellant was notified by Mr. Maud that said amount was due and must be paid. Appellant explained to Mr. Maud that because the lien of $17,300 had not been separated, he had been unable to sell or get a loan on the property and was unable at that time to pay the interest. Maud then made a proposition that if appellant would improve the property appellees would grant him an extension, stating at that time that appellees had not been able to get a separation of the lien, but that if appellant would make certain improvements on the property there would be no trouble in the world about being able to separate the lien and get the improvements made.

In reliance upon that statement, on July 1, 1927, appellant executed an extension agreement for the payment of said interest, and executed a note for $535 to Gold and Koennecke, payable in monthly installments of $25, beginning July 22, 1927, and on the 22d day of each succeeding month until the entire amount had

been paid in full. As an inducement to obtain such extension, appellant agreed to drill a well on the land to furnish water for farm and household uses, build a small dwelling house and a little barn on the land, and inclose the land with a substantial fence of such nature that the same would be acceptable to the San Antonio Joint Stock Land Bank for the purpose of granting a loan on said land. Appellant agreed to begin the construction of said improvements immediately and to complete them not later than December 1, 1927.

In compliance with the agreement, appellant made the monthly payments to appellees, and completed the improvements on the land, except a small barn. He then came to San Antonio to see the Joint Stock Land Bank, and it refused to grant him a separation, telling him to take it up with appellees. He reported that to Gold and Koennecke, on May 22, 1928, by letter; and on May 25, 1928, Albert Koennecke replied that he would be pleased to meet appellant at the Joint Stock Land Bank, on the 28th or 29th, and expressed the hope that they would be able to adjust the matter, and if it could not be arranged with the bank, then that they would arrange the matter of separation among themselves, and that "we can do that to our mutual satisfaction."

Appellant attended the meeting at the Joint Stock Land Bank, which was also attended by Gold and Koennecke, and there was a lengthy discussion about the separation of the loan. Mr. Koennecke did most of the talking. He asked about the separation, and Mr. Hopkins, the agent of the bank, refused to have anything to do with it. He asked Hopkins if it was possible to give appellant a portion of the land—one corner or the other—so that this separation could be made. Finally appellant asked Mr. Hopkins: "Have you fully made up your mind in regard to this separation?" And he said: "Yes. * * * I am not going to have a thing in the world to do with it." Appellant then asked Mr. Koennecke if it was possible for him to give appellant a tract of land somewhere else, equal to what he had on his farm, and Koennecke said, "No." Then appellant asked: "What are you going to do?" And he said: "Leave it as it is." Then Mr. Gold asked Mr. Hopkins if it was possible to take up the entire loan, and Hopkins said it would be up to the trustees. Mr. Gold asked if there was a bonus and Mr. Hopkins said, "Yes," and Gold said: "I wouldn't pay it." Appellant then asked Mr. Gold and Mr. Koennecke what they intended

to do about it, and they said they would leave it the way it was; that if appellant ever sold his land or traded it off, they would release the loan, separate the loan.

Appellant did not get any loan on his land, never got a separation of the indebtedness. When he found out he was not going to get a separation, he stopped building the little barn.

On the subject of equitable estoppel it is said: "Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting the rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has, in good faith, relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right either of property, of contract or of remedy." Pomeroy's Equity, vol. 2, § 804; Griffith v. Rife, 72 Tex. 185, 12 S. W. 168; Bridges v. Johnson, 69 Tex. 714, 7 S. W. 506; Edwards v. Dickson, 66 Tex. 613, 2 S. W. 718.

There is nothing in this case to show that appellant voluntarily misled appellees or caused a change in his position. Appellant relied in good faith upon the statement of Maud and executed the extension note and placed valuable improvements on the 284.6 acres, thereby increasing appellees' security. Appellees sold appellant's homestead, valued at more than $10,000, and kept the proceeds, some six months before the alleged extension agreement.

To permit this judgment to stand would deprive appellant not only of his homestead, but of the 284.6 acres conveyed to him, as well as the improvements placed thereon by appellant after he purchased the same.

No doubt on another trial the pleadings may be so shaped and evidence offered that justice may be administered. We sustain the assignments of error, and order the judgment reversed, and the cause remanded for a new trial.

SMITH, J.

I concur in the judgment of reversal, and in order overruling motion for rehearing, not because appellees were obligated or failed to show facts by which appellant was estopped to claim rescission, but because the questions of fraud and of waiver of the right to rescind were questions of fact which should have been submitted to the jury.